[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11026

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 12, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-01015-CV-JOF-1

EAGLE HOSPITAL PHYSICIANS, LLC.,

Plaintiff-
Counter Defendant-
Appellee,

versus

SRG CONSULTING, INC.,
HOSPITALIST PHYSICIANS, INC.,
STEVEN R. GERST,

Defendants-
Counter Claimants-
Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 12, 2009)

Before MARCUS, KRAVITCH and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant-Defendants, SRG Consulting, Inc., Hospitalist Physicians, Inc., and Dr. Steven Gerst, ("Appellants") appeal the imposition of sanctions and entry of a default judgment in favor of Plaintiff-Appellee, Eagle Hospital Physicians ("Eagle"). The district court struck Appellants' answer and counterclaims after discovering that Gerst had been secretly monitoring Eagle's confidential email communications and entered a default judgment against Appellants. We hold that the district court neither violated Gerst's Fifth Amendment rights nor abused its discretion and therefore affirm the imposition of sanctions and the entry of a default judgment.

## I. BACKGROUND

Eagle operates a business contracting hospitalists—doctors who specialize in the care and treatment of hospitalized patients—out to hospitals with whom it establishes contractual relationships. Gerst, principal owner of SRG and Hospitalist Physicians, Inc., owns approximately 10% of Eagle, personally or through his other companies. In July 1999, SRG and Eagle entered into a marketing and sales agreement (the "Agreement") pursuant to which SRG would provide marketing and sales services to Eagle to develop business contacts with hospitals for Eagle. Under the Agreement, "SRG [was] responsible for locating potential contractors, educating them about Eagle's hospitalist programs, and

2

performing any other services necessary to secure a hospitalist contract for Eagle." The Agreement provided that SRG would be paid a commission "[f]or each contract for hospitalist services executed between Eagle and another party which either SRG, or its agent, has secured on behalf of Eagle."

According to Eagle, the relationship between SRG and Eagle began to sour in 2002. Among other problems, the parties disagreed regarding the proper content for the website SRG maintained on Eagle's behalf, eaglehospitalphysicians.com. Eagle's CEO wrote to Gerst and requested that the website be transferred from SRG to Eagle. When Gerst refused to give Eagle access to the website, Eagle registered and began developing its own website, ehphospitalists.com. SRG then registered 150 domain names containing versions of Eagle's name and trademarks, including ehphospitalist.com—the singular form of Eagle's new site. Gerst informed Eagle that he would transfer the websites to Eagle only if Eagle paid him a large salary or gave him additional equity in Eagle. In his deposition, Gerst testified that, as a condition to transferring the domain names, he also requested hundreds of thousands of dollars from Eagle as compensation for the costs to create and maintain the websites, but later testified that the actual development costs were just over $67,000.

On October 21, 2003, Eagle sent written notice terminating the Agreement.

3

Gerst responded that Eagle did not have the authority to unilaterally terminate the Agreement and that it therefore remained in effect.

In April 2004, Eagle filed the present suit, asserting claims under the Anti-cybersquatting Consumer Protection Act, the Federal Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, and various state laws. Eagle also sought declaratory relief as to whether it owed any outstanding commissions to SRG under the marketing contract. Appellants filed counterclaims, seeking payment of those commissions.

On September 26, 2005, Gerst submitted an affidavit to the court. Attached to the affidavit were email documents sent between Eagle personnel and Eagle's attorneys. The documents were protected by attorney-client privilege. Eagle deposed Gerst in an attempt to find out how and when he had obtained the privileged and internal emails. Gerst invoked the Fifth Amendment throughout the deposition and refused to explain how and when he had intercepted these emails, whether he had help doing so, and whether he continued to have the ability to intercept privileged internal and attorney-client email communications. Eagle filed a motion for sanctions against Appellants, asserting three grounds for sanctions: (1) Appellants' refusal to answer questions concerning their ongoing ability to monitor communications between Eagle and its counsel; (2) Appellants' failure to pay attorney's fees as ordered by the court; and (3) Appellants' failure to produce

all responsive documents in discovery. The district court determined that reasons (2) and (3) did not justify sanctions, and that only reason (1) supported sanctions.[1] The court held a hearing to discuss Gerst's refusal to answer questions about how he obtained privileged information from Eagle. At the hearing, Eagle established that Gerst had accessed numerous privileged emails during a time period covering December 13, 2003 through September 13, 2005.

In its sanctions ruling, the court recognized, quoting In re Sunshine Jr. Stores, Inc., 456 F.3d 1291, 1305 (11th Cir. 2006), that the "severe sanction of a dismissal or a default judgment is appropriate only as a last resort, when less drastic sanctions would not suffice." The court found that "by acquiring information protected by the attorney-client privilege, attaching these documents to court filings, and not revealing whether any additional information has been obtained, Dr. Gerst has engaged in behavior that disrupts the litigation and is therefore in bad faith." The court noted that the "parties will never know the extent to which Dr. Gerst was able to 'eavesdrop' on" Eagle and its officers. The court inferred from Gerst's silence that he continued to maintain the ability to intercept communications and concluded that this ability created "a disruption to [Eagle] and

---

[1] Because the district court found that the alleged discovery violations were not sanctionable, the court's power to issue sanctions arose pursuant to its inherent power rather than under Fed. R. Civ. P. 37(b).

5

the litigation in general." The court considered whether lesser sanctions would suffice to punish and deter Appellants from future misconduct. Because, however, Gerst had already been privy to privileged information which he could not unlearn and because neither Eagle nor the court could know the extent of Gerst's activities, the court determined that no lesser sanctions than striking Appellants' answer and counterclaims would suffice.

After briefing from both parties, the court ruled on the appropriate damages and remedies resulting from the sanctions. Because the answer and counterclaims were struck, Appellants had defaulted. Due to their default, the court found that Appellants admitted all well-pleaded claims contained in the complaint and held that Eagle had established Appellants' liability on the cybersquatting claim. The court awarded statutory damages of $1,000 for each of the twenty-four domain names the parties called "minor" and $10,000 for each of the three "main" domain names. The court also awarded attorney's fees to Eagle in light of Appellants' misconduct. Appellants timely appealed.

## II. STANDARD OF REVIEW

This court reviews assertions of constitutional error de novo. United States v. Anton, 546 F.3d 1355, 1357 (11th Cir. 2008).

We review a court's imposition of sanctions under its inherent powers for

6

abuse of discretion.  Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991).  "In determining whether the court abused its discretion we ask whether it 'applie[d] the wrong legal standard or ma[de] findings of fact that are clearly erroneous.'"  Byrne v. Nezhat, 261 F.3d 1075, 1103 (11th Cir. 2001) (quoting United States v. Sigma Int'l, Inc., 244 F.3d 841, 852 (11th Cir. 2001)).

Finally, we review the sufficiency of a complaint de novo.  See Financial Security Assur., Inc. v. Stephens, Inc., 450 F.3d 1257, 1262 (11th Cir. 2006) (reviewing the dismissal of a complaint for failure to state a claim de novo).

## III.  DISCUSSION

*Gerst's Fifth Amendment Rights*[2]

Appellants contend that the district court erred twice in its decision to strike their answer and counterclaims.  First, Appellants argue that the court violated Gerst's Fifth Amendment rights by drawing adverse inferences from his refusal to testify.  Second, Appellants argue that the court violated Gerst's Fifth Amendment rights by sanctioning him and dismissing his suit in response to his assertion of his Fifth Amendment rights.  We disagree on both counts.

Appellants' first argument was not preserved for appeal.  Appellants failed to argue to the district court that adverse inferences could not be drawn from

---

[2] We note that corporations do not have any Fifth Amendment rights and so only Gerst's Fifth Amendment rights are at issue.  See Braswell v. United States, 487 U.S. 99, 102 (1988).

7

Gerst's Fifth-Amendment-protected silence. In fact, during the October 22, 2007 hearing, Appellants' attorney stated that he did not intend to challenge the district court's order with respect to the drawing of inferences, and that "the law is clear" that "the court is entitled to draw adverse inferences" from Gerst's silence. By failing to raise the issue to the district court, Appellants have waived their right to argue on appeal that the inferences were impermissible. See BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1140 (11th Cir. 2007) (noting that "as a general rule in civil cases this court does not consider issues raised for the first time on appeal").

We note, however, that in a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment. United States v. Two Parcels of Real Prop. Located in Russell County, Ala., 92 F.3d 1123, 1129 (11th Cir. 1996). Gerst invoked the Fifth Amendment in response to questions about how he intercepted Eagle's privileged communications and whether he continued to have access to such communications. The court's inference that Gerst maintained the ability to monitor Eagle's confidential emails was a permissible, reasonable inference.

We turn next to Appellants' assertions that Gerst's Fifth Amendment rights were violated when the court entered a default judgment in favor of Eagle because

8

Gerst invoked the Fifth Amendment.[3]

The decision to invoke the Fifth Amendment does not have to be consequence-free. United States v. White, 589 F.2d 1283, 1287 (5th Cir. 1979)[4] ("Any 'waiver' of the fifth amendment must be voluntary, but invocation of the privilege does not release defendant from any choice concerning the use of his or her testimony."). The court, however, must not "so unduly burden the employment of silence as to make the decision to testify involuntary." Id. The automatic entry of an adverse judgment solely as a result of the assertion of the Fifth Amendment has been held to be an undue burden, impermissible under the Constitution. Wehling v. Columbia Broad. Sys., 608 F.2d 1084, 1087 (5th Cir. 1979) (noting that courts should not force a party to choose between his Fifth Amendment right to silence and his due process right to a judicial determination of his civil action); see also Baxter v. Palmigiano, 425 U.S. 308, 317-18 (1976). Additionally, a dismissal following the assertion of the Fifth Amendment violates the Constitution where the inferences drawn from Fifth-Amendment-protected silence are treated as

---

[3] Contrary to Eagle's contention, the district court did not issue sanctions based on an aggregation of misconduct by Appellants, but rather just on the interception of emails. Although Eagle alleged various misdeeds in its motion for sanctions, the court discussed each potential ground for sanctions in its March 14, 2007 order and dismissed or addressed separately each instance of alleged misconduct except for Gerst's surveillance of Eagle's confidential emails.

[4] Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this court. See Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

9

a substitute for the need for evidence on an ultimate issue of fact.  Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir. 1991).

Here, Gerst's assertion of the Fifth Amendment was not unduly burdened because the dismissal was not a punishment for invoking the Fifth Amendment. The court did not enter a dismissal *because* of Gerst's use of the Fifth Amendment. Rather, Eagle had introduced evidence that Gerst had been improperly intercepting confidential emails of the opposing party and that Gerst refused to answer questions about whether he could continue to do so.  This evidence of misconduct established that Gerst had disrupted the litigation, and the district court felt it was necessary in light of the disruption to strike Appellants' pleadings and enter a default judgment for Eagle.  The dismissal issued as a result of the disruption, not as a direct result of Gerst's invocation of the Fifth Amendment.  Under the circumstances in this case, the court assigned the proper evidentiary weight to Gerst's silence.  Baxter, 425 U.S. at 318 (finding no error where a party's "silence was given no more evidentiary value than was warranted by the facts surrounding his case"); see also White, 589 F.2d at 1286-87 (distinguishing between improper automatic dismissals following constitutionally-protected silence and the giving of proper evidentiary weight to reasonable adverse inferences).

Furthermore, even if the court's dismissal can be said to flow directly from

Gerst's invocation of the Fifth Amendment, it was not improper under the circumstances of the case. In Wehling, the Former Fifth Circuit stated that an automatic dismissal for hiding behind the Fifth Amendment may be employed as a remedy of last resort to prevent unfairness to the other party. 608 F.2d at 1087 n.6. Courts must balance the relative weights of the parties' competing interests to see "that the rights of both parties are taken into consideration before the court decides whose rights predominate." Id. at 1088. Here, the district court carefully evaluated the competing interests of the two parties in light of Gerst's misconduct. The court also recognized that the sanction of dismissal with prejudice was extreme and should be used only as a last resort. The court found that Gerst acted in bad faith, and that severe sanctions were necessary because neither Eagle nor the court would know the extent of Gerst's activities or how Gerst's ability to continue to monitor communications would prejudice Eagle's position in the litigation. The court also thought that severe sanctions were necessary "as a deterrent to other litigants contemplating improper interception of communications between clients and their attorneys." Thus, the court found that the nature of Gerst's bad faith misconduct "mandate[d] that no sanction lesser than striking of Defendants' answer and counterclaims [would] suffice." This careful and thorough reasoning shows that the district court concluded that the unfairness to Eagle outweighed

11

Gerst's interest in his Fifth Amendment rights.[5]

Additionally, the dismissal did not occur as the result of an improper substitution of Gerst's silence for necessary evidence because Gerst did not assert the Fifth Amendment in relation to an issue that impacted the merits of the litigation. The court did not infer liability on a claim from Gerst's silence. Rather, the subject of Gerst's invocation of the Fifth Amendment went to his litigation misconduct. The court made permissible, reasonable inferences about his misconduct from both Gerst's silence about his ongoing activities and from Eagle's evidence showing that Gerst had been intercepting privileged information for nearly two years. The court imposed sanctions based on these factual findings, not upon Gerst's decision to invoke the Fifth Amendment.

*The Court's Use of Its Inherent Power to Impose Sanctions*

Appellants argue that even if the district court could, without running afoul of the Fifth Amendment, impose sanctions against them, the court abused its discretion and violated their due process rights in selecting such a severe sanction. Appellants argue that the sanction was disproportionately severe, was not

---

[5] Additionally, some cases suggest that the rule barring dismissal for invoking the Fifth Amendment in a civil case only applies where the party asserting the Fifth is also a defendant in a criminal case and his civil testimony would directly impact his criminal liability. See United States v. Premises Located at Route 13, 946 F.2d 749, 756 (11th Cir. 1991). No one has suggested that Gerst is, or potentially will be, a criminal defendant based on his interception of communications between Eagle and its attorneys.

12

specifically related to the misconduct, and lesser sanctions were available and would have been effective. We disagree.

A court may impose sanctions for litigation misconduct under its inherent power. Chambers, 501 U.S. at 43-44; In re Sunshine Jr. Stores, 456 F.3d at 1304. The court's inherent power derives from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers, 501 U.S. at 43 (quotation marks and citation omitted). This power, however, "must be exercised with restraint and discretion." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980).

"The key to unlocking a court's inherent power is a finding of bad faith." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). We therefore begin by reviewing the district court's finding that Gerst acted in bad faith. A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order. Byrne, 261 F.3d at 1121. Here, the court noted that the documents attached to Gerst's affidavit demonstrated that Gerst had access to privileged materials covering a period from December 13, 2003 through September 13, 2005 and reasonably inferred that Gerst had engaged in extensive and disruptive surveillance of privileged communications. From Gerst's refusal to explain the extent of his electronic eavesdropping or his ongoing ability to

13

intercept privileged communications, the court inferred that Gerst "continue[d] to maintain the ability to intercept the communications." Because Gerst was a doctor and a frequent litigator, the court surmised that Gerst would be familiar with the notion of privileged information and would know that he should not be intercepting confidential emails. The record supports the district court's finding that Gerst acted in bad faith.

As the finding of bad faith properly unlocked the court's inherent powers, we turn to the question of whether the court violated Gerst's due process rights or abused its discretion in fashioning this particular sanction. The "[d]ismissal of a party's complaint or answer, or striking its defenses, as a sanction . . . is a heavy punishment," appropriate "only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." In re Sunshine Jr. Stores, 456 F.3d at 1305-06. "However severe the sanctions though, we will not interfere unless important historical findings are clearly erroneous or — by the imposition of sanctions which are not just — there has been an abuse of discretion." Id. at 1306 (quoting Jaffe v. Grant, 793 F.2d 1182, 1189 (11th Cir. 1986)).

The court considered other lesser sanctions, and held a hearing with both parties to determine whether lesser sanctions would suffice.[6] The court felt that a

---

[6] The extensive hearings and briefing on the issue of sanctions provided Appellants a sufficient chance to be heard. See Chambers, 501 U.S. at 57 (noting that due process requires

14

severe sanction was necessary "to act as a deterrent to other litigants contemplating improper interception of communications between clients and their attorneys" because permitting this case to continue would be an open invitation to others to abuse the judicial process. The court reasonably concluded that Gerst's egregious misconduct disrupted the litigation, his ongoing ability to intercept confidential and privileged emails would make it untenable for Eagle to continue litigating against Gerst and his closely-held corporations, and that extreme sanctions were necessary to punish Appellants and deter others. We agree that striking Appellants' answer and counterclaims and entering a default judgment were commensurate with the level of misconduct and hold that the district court did not abuse its discretion.

Nor are we persuaded that the sanctions here were not specifically related to the misconduct and therefore constituted an abuse of discretion. This court has affirmed similar sanctions in response to egregious conduct. In Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987), this court affirmed the district court's decision to strike the defendant's answers and enter a default judgment in favor of the plaintiff due to discovery abuses. This court found no abuse of discretion in light of the defendant's pattern of delay and refusal to obey court orders, as well as the need to deter others from flouting discovery orders. Id. In In

hearings and notice before the imposition of sanctions).

15

re Sunshine Jr. Stores, 456 F.3d at 1306, this court determined that a "clear history of bad faith stonewalling" in the litigation justified the district court's decision to enter judgment against the misbehaving party because its conduct meant that it had "forfeited its opportunity to dispute . . . its liability." Here, in the face of egregious misconduct that indicated all of Eagle's confidential email communications had been and would continue to be monitored, the district court decided that the answers and counterclaims must be struck. Under Buchanan and In re Sunshine Jr. Stores, this decision was within the discretion of the district court.

*Sufficiency of the Complaint as to Eagle's Cybersquatting Claim*

A "defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975); Buchanan v. Bowman, 820 F.2d at 361. "A default judgment is unassailable on the merits, but only so far as it is supported by well-pleaded allegations." Nishimatsu, 515 F.2d at 1206. A default defendant may, on appeal, challenge the sufficiency of the complaint, even if he may not challenge the sufficiency of the proof. Id.

Cybersquatting is a form of trademark misuse. "This activity is defined to be the conduct of one who reserves with a network information center a domain

16

name consisting of the mark or name of a company for the purpose of relinquishing the right to the domain name back to the legitimate owner for a price." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:17 (4th ed. 2008). Congress decreed cybersquatting a federal crime. 15 U.S.C. § 1125(d). A person commits cybersquatting

> if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that –
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> (III) is a [protected] trademark, word, or name . . . .

15 U.S.C. § 1125(d).

Appellants assert that the complaint did not allege they had a bad faith intent to profit from the mark as required by § 1125(d)(1)(A)(i). Paragraph 53, however, states "Upon information and belief, Defendants continue to use the domain names with the bad faith intent of profiting unlawfully from Eagle's trademarks." The complaint thus alleged a bad faith intent to profit from the mark. Appellants further argue that accepting this allegation as true was improper because it conflicted with the court's previous finding that Appellants' creation of the websites was not done in bad faith. We believe Appellants misunderstand the

17

district court's prior rulings. In an earlier ruling on a motion for summary judgment, the court found that there was a *possibility* that Appellants did not act in bad faith and their conduct may be covered by the "safe harbor" provision of the cybersquatting statute, making summary judgment improper. The court did not make a finding that there was no bad faith.

Appellants raise additional arguments that the complaint was insufficient in their brief to this court. These arguments, however, were not raised before the district court. As these alleged problems with the complaint were not raised below, we will not review them now. See BUC Int'l Corp., 489 F.3d at 1140.

*Termination of Agreement and Commissions Earned*

Because we hold that the sanctions and the default judgment were not improper, Appellants' remaining challenges to the district court's interlocutory rulings are moot.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's entry of judgment in favor of Eagle.